IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CURTIS H., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 21-CV-238-SMY |
| ) | |
| KILOLO KIJAKAZI, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Curtis H. seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB on December 7, 2018, alleging a disability onset date of December 23, 2017 (Tr. 248-250, 379-380). His claim was denied initially on March 29, 2019 (Tr. 246, 268-271) but approved on reconsideration on October 20, 2019 (Tr. 267, 280-282). Upon reconsideration, Plaintiff was found to be disabled from August 26, 2019, not December 23, 2017 (Tr. 282). Disagreeing with this aspect of the determination, Plaintiff requested an evidentiary hearing which took place on June 9, 2020 (Tr. 204, 288, 290).

Following the hearing, an Administrative Law Judge ("ALJ") denied Plaintiff's application on July 9, 2020, finding that Plaintiff was "not disabled" for the entirety of the period since December 23, 2017 (Tr. 182-195). The Appeals Council denied Plaintiff's request

for review on December 28, 2020, making the ALJ's decision the final agency decision subject to judicial review (Tr. 1).

**Issues Raised by Plaintiff**

Plaintiff raises the following issues for judicial review:

1. The ALJ erred by independently interpreting the October 2019 MRI of Plaintiff's lumbar spine.

2. The ALJ erred by failing to account for Plaintiff's lumbar spine in formulating his Residual Functional Capacity ("RFC") determination.

3. The ALJ failed to resolve a conflict between the testimony of the Vocational Expert ("VE") and the Dictionary of Occupational Titles ("DOT") regarding the job of cardiac monitor technician.

**Legal Standard**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

In determining whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his or her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R.

§ 404.1520.  An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled.  A negative answer at any step, other than at step 3, precludes a finding of disability.  The claimant bears the burden of proof at steps 1–4.  Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. § 405(g).  Thus, the Court is not tasked with determining whether Plaintiff was disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for substantial evidence, the Court considers the entire administrative record, but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).  At the same time, judicial review is not abject; the Court does not act as a rubber stamp for the Commissioner.  *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## Decision of the ALJ

The ALJ followed the five-step analytical framework with respect to Plaintiff's application.  He determined that Plaintiff had not worked at the level of substantial gainful activity since the alleged onset date despite an unsuccessful work attempt (Tr. 185).  He found that Plaintiff suffered from the following impairments: coronary artery disease and

supraventricular tachycardia; history of coronary artery bypass surgery; chronic pain syndrome; asthma; obstructive sleep apnea; intercostal neuropathy; and degenerative disc disease (Tr. 185). He concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404 (Tr. 187).

The ALJ analyzed the medical documentation and disability standard with respect to Plaintiff's spine and noted:

> To satisfy listing 1.04 (disorders of the spine), the disorder must result in the compromise of a nerve root or the spinal cord with evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of spine, motor loss, accompanied by sensory or reflex loss, and if there is involvement of the back, positive straight-leg raising test; or spinal arachnoiditis, confirmed by an operative note, pathology report, appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively. Imaging showed mild lumbar spondylosis with mild degenerative changes at L4-5. There was a mild disc bulge noted with lateral recess stenosis on the left and evidence of bilateral facet effusions at L3-4 and L4-5. There was no central canal stenosis noted (24F/5; 26F/5). The claimant also had no spinal tenderness, full range of motion, and normal gait and station and balance (7F/6; 11F/26; 13F/2; 24F/4, 8; 26F/4, 8).

(Tr. 187)

Based on the opinions of the state agency physicians regarding Plaintiff's chest and heart issues, the ALJ determined that Plaintiff had the following Residual Functional Capacity ("RFC"):

> Sedentary work as defined in 20 CFR 404.1567(a) except never climb ladders, ropes or scaffolds, or crawl, and occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; frequently handle and finger with the left upper extremity; and would need to avoid concentrated exposure to extreme cold,

> extreme heat, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards.

(Tr. 189)

He noted that, "Although the claimant's additional limitations do not allow the claimant to perform the full range of sedentary work, considering the claimant's age, education and transferable work skills, a finding of 'not disabled' is appropriate under the framework of Medical-Vocational Rule 201.22 and Rule 201.15" (Tr. 195).

The ALJ credited the Vocational Expert's testimony and determined that Plaintiff was unable to perform his past relevant work as a registered nurse (Tr. 193-194). However, he concluded that Plaintiff was not disabled because based on his transferrable work skills from past relevant work and his sedentary RFC, he could work as a cardiac monitor tech (Tr. 194).

## The Evidentiary Record

The Court reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

### Agency Forms

Plaintiff was born in 1969 and was 48 years old on the alleged onset date of December 23, 2017 (Tr. 233). He filed for disability based on "multiple heart issues, chronic pain, multiple infections, cabg, intercostal neuropathy, depression, anxiety, complications from scar tissue, stent, arrythmia, alpha one anitriphsenia deficinciy [sic] disorder, non-alcoholic fatty liver, autoimmune hepitis [sic]" (Tr. 234).

**Evidentiary Hearing**

Plaintiff was represented by a non-legal representative at his hearing on June 9, 2020 (Tr. 204) and testified to the following: Plaintiff earned an associate's nursing degree in 1995 (Tr. 214). He last worked for the Census Bureau in July and August of 2019 (Tr. 214). He verified addresses but his supervisors admonished him for not verifying more quickly and he developed back pain (Tr. 215). The Census Bureau terminated Plaintiff by ceasing to give him new assignments (Tr. 216). Prior to that job, Plaintiff worked as a Registered Nurse ("RN") for the Department of Veterans Affairs in Marion, Illinois (Tr. 217).

On October 30, 2015, Plaintiff had open heart surgery and was off work for 6 months (Tr. 218). When he returned to work, he was on light duty because of lifting restrictions (Tr. 218). The Department of Veterans Affair eventually opted to have Plaintiff retire (Tr. 219). In Plaintiff's career, he also worked as a traveling nurse and as a RN at Deaconess Hospital (Tr. 220).

Plaintiff testified that he was disabled because he deals with "a lot of chronic pain and then cardiac chest pain" (Tr. 221). He has nerve and muscle damage in his sternum that had to rebuild with titanium plates (Tr. 221-222). Plaintiff has chronic back pain in the cervical, mid back, and lower back area (where he has had injections) and has been diagnosed with mild to moderate degenerative disease (Tr. 222).

Vocational expert Lisa A. Courtney testified that Plaintiff's sedentary RFC precludes past work (Tr. 227). However, Plaintiff had the transferable skills to perform a cardiac monitor tech job, with DOT Code of 078.367-010 (Tr. 227). Cardiac monitor tech jobs number "at least 75,000" in the national economy (Tr. 228). The VE further testified that Plaintiff could perform several unskilled jobs, such as stuffer, inspector, and surveillance system monitor (Tr.

228-229). Without objection from Plaintiff's representative, the VE noted that her testimony was consistent with the information in the DOT (Tr. 229). Plaintiff's representative questioned the VE as to whether Plaintiff's medicine would affect the VE's analysis but did not phrase the question in terms of a hypothetical limitation. He ultimately withdrew the question (Tr. 230).

## Relevant Medical Records

On October 2, 2015, Plaintiff had a left ureteroscopy with stone extraction and left stent placement procedure performed at Herrin Hospital (Tr. 119). The preoperative and postoperative diagnosis was a "left ureteral calculi" (Tr. 119).

On October 30, 2015, Plaintiff underwent a coronary artery bypass grafting (referenced in various records and follow up visits) (Tr. 1004). Plaintiff had two additional stents placed in his heart in 2016 (Tr. 1018): a stent was placed in the left circumflex at Carbondale in July 2016; and a left main stent was placed in August 2016 at Heartland Regional Medical Center (Tr. 1128).

On November 4, 2015, Plaintiff was admitted to St. Vincent Hospital for an "open sternal wound" and an examination of the PICC Chest Special View found "right PICC line catheter extends into the SVC but the tip is not well localized" as well as "cardiomegaly with findings suggesting mild congestive heart failure" (Tr. 579).

On November 9, 2015, Plaintiff was admitted to St. Vincent Hospital for sternal wound drainage (Tr. 534). He was given some additional medications (Tr. 535). He had a sternal dehiscence procedure performed (Tr. 606). A CT scan of his chest on the same day showed "sternal wound dehiscence with gas and fluid collections seen in the anterior mediastinum and

in the subcutaneous tissues anterior to the sternum, suspicious for abscesses", along with "pleural effusions and bibasilar atelectasis, worse on the left" (Tr. 574).

On April 11, 2016, Plaintiff underwent an Echocardiogram that showed normal functioning, including that the left ventricular cavity and right ventricle were normal (Tr. 527-528).

On April 27, 2016, Plaintiff had a myocardial perfusion SPECT at St. Vincent Heart Center that found "no evidence of myocardial infarction or ischemia", "normal perfusion scan", and a "normal left ventricular size and ejection fraction" (Tr. 512).

On June 4, 2016, Plaintiff went to the Emergency Department at Richland Memorial Hospital complaining of chest pain (Tr. 36). He was diagnosed with non-traumatic chest pain and discharged (Tr. 39).

On December 6, 2016, Plaintiff had a "bilateral carotid artery Doppler" that found "no significant hemodynamic stenosis of the bilateral internal carotid arteries" at the SIH Herrin Hospital (Tr. 898-899).

On April 20, 2017, Plaintiff underwent an Echocardiogram at Mayo Clinic in Rochester Minnesota that found largely normal findings, including "normal cardiac valves", "normal left ventricular chamber size" and "normal right ventricular size with probable normal function" (Tr. 625).

On May 23, 2017, Plaintiff presented to the SIH Medical Group Pulmonology with Alpha 1 antitrypsin deficiency (Tr. 793). He was advised to continue a previous course of treatment (Tr. 798).

On May 26, 2017, Plaintiff had a cardiac check-up at Prairie Cardiovascular Consultants (Tr. 1128). The diagnostic impression was "Normal left ventricular end diastolic

pressure. No significant pulmonary hypertension. There is well revascularized coronary artery disease" (Tr. 1129).

On June 1, 2017, Plaintiff underwent surgery at Mayo Clinic that involved the removal of seven loose screws and retained hardware (Tr. 716-717). The post operative diagnosis was a painful sternum with a history of sternal infection requiring sternal plating (Tr. 717).

On June 3, 2017, Plaintiff underwent imaging of his chest that showed, "Multiple surgical clips project over the mediastinum and upper abdomen. Improvement in the right lung atelectasis. No pneumothorax." (Tr. 737-738).

On June 17, 2017, Plaintiff went to SIH Herrin Hospital for atrial fibrillation with right ventricular response (Tr. 836). He was admitted through the emergency room because of palpitations and atypical chest discomfort (Tr. 836) and was diagnosed with "paroxysmal atrial fibrillation with rapid ventricular response converted to sinus rhythm with amiodarone therapy" (Tr. 837).

On November 8, 2017, Plaintiff underwent a Bruce Protocol Myocardial Perfusion Imaging at Herrin Hospital (Tr. 1162). The test found no myocardial perfusion defects and a "negative ECG response to stress", a "normal myocardial perfusion without stress induced ischemia," and a "normal left ventricular systolic function, calculated post stress ejection fraction is 75%" (Tr. 1162). On the same day, he underwent a Transthoracic Echocardiography that concluded, "<u>Left ventricle</u>: The cavity size is normal. Wall thickness is normal. Systolic function is normal. The estimated ejection fraction is 68%. Wall motion is normal; there are no regional wall motion abnormalities" (Tr. 1164).

On November 30, 2017, Plaintiff had a cardiac catheterization procedure performed at Good Samaritan Hospital (Tr. 1083). The doctor performed several tests, including a left

ventriculography, a selective coronary arteriography, and a bypass graft arteriography (Tr. 1083). The impression was "normal left ventricular size and systolic function", "significant native 3-vessel coronary artery disease", "widely patent stent found in the left main extending into the circumflex", and "widely patent coronary artery bypass grafts with no lesions noted within the graft, excellent fill of the distal circulation" (Tr. 1084).

Between December 2016 and April 2020, Plaintiff saw therapists Sharon Pridgen, LCSW, and Emily Heineke, LCSW at the Samaritan Center for individual therapy sessions. He worked on cognitive reframing, problem solving exercises, skill development, and assessment of needs and functional level (Tr. 1097). He frequently expressed frustration with the Veterans' Administration and his case (Tr. 1092-1097) and dealt with anger issues (Tr. 1120). On April 2, 2018, Plaintiff expressed a goal of "walking [the] Appalachian Trail" (Tr. 1272).

On January 12, 2018, Plaintiff went to Stevens Chiropractic with back issues and rated his discomfort in his lumbar spine as a "2 on a scale of 10" (Tr. 47). The medical record notes that, "The symptoms are made better with Resting, Non-Use of the affected region and Chiropractic Treatment" (Tr. 47). The prognosis was good as Plaintiff felt better after the treatment (Tr. 48). On March 23, 2018, during a follow up visit, there is a note that, "[Plaintiff] is 90% better than the first visit" (Tr. 52).

Plaintiff continued having follow up visits at Stevens Chiropractic. On June 25, 2019, Plaintiff noted that his "symptoms are worse with driving, recreation, lifting, walking, standing, end ranges of motion of the affected region, increased use, reaching, pulling, cervical rotation, lumbar flexion, lumbar extension and lumbar rotation" (Tr. 62). The doctor noted that, "[Plaintiff's] prognosis is good at this time. [Plaintiff] felt better after the treatment and

experienced an increase in passive and active joint motion and a decrease in his symptoms with treatment" (Tr. 63). At one of the last visits in the transcript, the doctor notes that, "Today's treatment was tolerated without incident; [Plaintiff] stated feeling better. Curtis's next visit is un-determined due to leaving town" (Tr. 88).

On February 7, 2018, Plaintiff went to the Prairie Cardiovascular Consultants, Ltd., where Dr. Nabil Alsharif assessed Plaintiff has having "CCS class I – angina only during strenuous or prolonged physical activity" (Tr. 1152).

On October 8, 2019, Plaintiff underwent an X-ray to his lumbar spine at Good Samaritan Hospital that showed "mild lower lumbar degenerative disc disease" (Tr. 1238-1239).

On October 17, 2019, according to a consult from the Orthopedic Institute of Southern Illinois, Plaintiff underwent an MRI of the lumbar spine that demonstrated mild to moderate stenosis at the left lateral aspect of the spinal canal and mild stenosis at the central portion of the spinal canal secondary to a disc protrusion, no foraminal stenosis, and a disc protrusion associated with approximately 1 mm posterior displacement of traversing left sided L5 nerve root at the left lateral recess of the spinal canal (Tr. 1354).

On November 4, 2019, Plaintiff had a follow up consultation with the Orthopedic Institute of Southern Illinois. He presented with chronic non-traumatic pain and stated that the symptoms are variable and relieved by lying down and medications (Tr. 1320).

On November 8, 2019, Plaintiff underwent a Bilateral Sacroiliac Joint Injection at the Orthopedic Institute of Southern Illinois with a pre- and post-procedure diagnosis of chronic pain and right and left sacroiliitis (Tr. 1325-1327).

On November 18, 2019, Plaintiff had a Bruce Protocol Myocardial Perfusion Imaging with Attenuation Correction at the Memorial Hospital of Carbondale (Tr. 1258). The impression was that of, "Negative ECG response to exercise", "normal myocardial perfusion without stress induced ischemia", "normal left ventricular systolic function, calculated post stress ejection fraction is 75%", and "excellent exercise tolerance, achieving 13.7 mets of physical activity" (Tr. 1258).

On December 9, 2019, Plaintiff saw Mansoor Khan, MD for a follow up appointment of lumbar pain that he rated as "3/10 on VAS" (Tr. 166). Dr. Khan noted, "Patient reports his lumbar pain being well controlled at this time due to reject injection with Dr. Lee (Tr. 168). Dr. Khan treated Plaintiff during other visits for sternum pain as well (Tr. 1174-1175).

Plaintiff noted on December 19, 2019 that following the procedure on November 8, 2019, he had pain relief and rated his current pain as "2/10" (Tr. 1328).

### State Agency Consultants' Opinions

The ALJ relied on two state agency consultants in his decision: On March 28, 2019, cardiologist Dr. Frank Mikell opined that Plaintiff had exertional and postural limitations but could stand or walk for 2 hours with normal breaks and sit with normal breaks for about 6 hours in an 8-hour workday (Tr. 242-243). Dr. Mikell found that Plaintiff could occasionally climb ramps and stairs, balance, kneel, and crouch (Tr. 243) but could never climb ladders or crawl (Tr. 243). On August 22, 2019, anesthesiologist Dr. Prasad Kareti evaluated Plaintiff and found similar restrictions (Tr. 260).

Two psychological state consultants, Howard Tin, PsyD, and David A. Harley, PhD., noted, "Claimant's allegation of the severity of the disorder is not consistent with claimant's

ability to function generally well from day to day" (Tr. 241, 258). Both psychologists found that the claimant did not have a severe mental impairment (Tr. 241, 258).

## Discussion

Plaintiff's arguments that the ALJ failed to consider an additional lumbar spine MRI and limitations of the lumbar spine are belied by the ALJ's determination that Plaintiff was limited to an RFC of sedentary work. Despite finding that the imaging showed only a "mild lumbar spondylosis with mild degenerative changes at L4-5" and "no spinal tenderness, full range of motion, and normal gait and station and balance" (Tr. 191-192), the ALJ nevertheless credited the state agency doctors in finding that Plaintiff was strictly limited to sedentary work – a high restrictive level that results in a finding of disability unless the claimant has transferrable skills. See, SSR 96-9p. See also, *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) (ALJ may accept the opinions of state-agency medical experts when claimants do not provide evidence of further limitation). The ALJ also concluded that Plaintiff could not "perform the full range of sedentary work" (Tr. 195). Plaintiff failed to provide evidence of limitations beyond the sedentary level based on the condition of his lumbar spine. In fact, one of the most recent medical records in the transcript (from December 2019) noted that Plaintiff rated his pain as "2/10" with relief following an injection (Tr. 1328). *Id.* Additionally, records or recent visits with Mansoor Khan, MD indicate that the lumbar issues were under control (Tr. 168). "When no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error". *Dudley v. Berryhill*, 773 F.App'x 838, 843 (7th Cir. 2019).

The ALJ did not independently interpret the lumbar spine MRI or "play doctor." Rather, he appropriately used his fact-finding discretion to determine that such findings would not modify the state agency doctors' highly restrictive RFC of sedentary work. *Id.* He accounted

for these spine issues by discussing the findings of Dr. Tennyson Lee and Dr. Jeffrey Jones, both of whom interpreted MRI examinations of the Plaintiff's spine. (Tr. 191-192, 1354, 1347-1350.)

An ALJ errs in accepting a reviewing doctor's opinion if the reviewer did not have access to later medical evidence containing "significant, new, and potentially decisive findings" that could "reasonably change the reviewing physician's opinion." *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). However, "[n]ot all new evidence" received following the state agency consultants' opinions will require a remand. *Kemplen v. Saul,* 844 F. App'x 883, 887 (7th Cir. 2021). "An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Given that the new lumbar spine findings of mild degeneration and "2/10" pain relief were not potentially decisive (treating doctors had already reviewed these issues in the record, and the state agency doctors had already significantly restricted the Plaintiff to sedentary work), the ALJ properly exercised his discretion to use the RFC of sedentary and not re-consult with the state agency doctors. *Keys v. Berryhill*, 679 F.App'x 477, 480-81 (7th Cir. 2017), quoting *Schneck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (noting that if "an ALJ were required to update the record any time a claimant continued to receive medical treatment, a case might never end").

With respect to the purported conflict between the VE's testimony and the DOT, the ALJ properly asked the VE whether her testimony is consistent with the DOT; she testified that it was consistent (Tr. 229). *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). Plaintiff's representative failed to object at that time. *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) (allowing an ALJ to rely on imperfect VE testimony if a claimant does not

question the basis for the testimony during the hearing). Unless there is an obvious conflict between the VE's testimony and the DOT, there is no further burden on the ALJ to resolve that conflict. *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2008). Moreover, the purported inconsistency was the DOT cross-referencing in the last sentence of the job description that a cardiac monitor job, 078.367-010 in the DOT, may perform duties of an electrocardiograph technician; this does not appear to present a clear conflict, much less an obvious one. The same DOT job description explicitly notes that it is a sedentary position and that, "Sedentary work involves sitting most of the time." 1991 WL 646826.

At the hearing, the ALJ asked the VE how many jobs exist for cardiac monitoring, and reasonably relied on the VE's response that, "There is – I'm gonna say at least 75,000, and that's probably a lowball number. They're pretty prevalent, because clinics have 'em, and hospitals have 'em" (Tr. 228). 20 C.F.R. § 404.1566(e). Plaintiff's arguments that the ALJ should have consulted random job postings for job duties or considered whether the Plaintiff could have worked as a cardiac tech at the Veterans Health Care Administration is not supported by authority; it is standard for the ALJ to rely instead on the VE. *Id*. Similarly, Plaintiff's argument that the DOT is outdated is a policy argument. SSA regulations mandate taking notice of it as "reliable job information." 20 C.F.R. § 404.1566(d)(1).

## Conclusion

After a careful review of the record, the Court finds that ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED.** The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

DATED:  September 15, 2022

**STACI M. YANDLE**
**United States District Judge**